Elmer L. ANDERSON and Sydne K. Anderson, Plaintiffs-Appellants,

v.

BOURBEUSE VIEW, INC. and Fuqua Homes, Inc., Defendant-Respondent.

No. 51137.

Missouri Court of Appeals, Eastern District, Division One.

March 24, 1987.

David C. Godfrey, Clayton, for plaintiffs-appellants.

George A. Dorsey, Lee Gary Kline, Clayton, for defendant-respondent.

KELLY, Presiding Judge.

Elmer L. and Sydne K. Anderson, husband and wife, plaintiff-appellants, filed this action in two Counts, Count I against Bourbeuse View, Inc., doing business as New Concept Homes ("New Concept") for breach of contract and Count II against defendant-respondent, Fuqua Homes, Inc. ("Fuqua") for tortious interference with a contractual relationship. The case was tried to a jury, but at the close of the plaintiffs' evidence the trial court sustained

a motion for directed verdict.[1] The Andersons have appealed this ruling.

We affirm the judgment of the trial court.

New Concept, a retail dealer of mobile homes in Times Beach, Missouri, maintained a small inventory of mobile homes on its sales lot. To acquire this inventory New Concept arranged with General Electric Credit Corporation ("GECC") to provide the necessary financing to pay the various manufacturers for the mobile homes. In return for the funds GECC lent New Concept, GECC maintained a security interest in the mobile homes financed by retaining the manufacturer's certificate of origin. Included in this arrangement was a stipulation that the manufacturer would repurchase the financed mobile homes from the dealer if the dealer defaulted in its agreement with GECC.

Although the formal contracts are not before us as exhibits, from the transcript we are able to make the following observations concerning GECC's and New Concept's business relationship.

In September of 1981, New Concept arranged with GECC to purchase a Fuqua Model 961 mobile home from Fuqua. GECC approved the purchase and paid Fuqua for the mobile home. Fuqua delivered the mobile home to New Concept's sales lot. During this period GECC held the manufacturer's certificate of origin on this particular mobile home as a security interest until New Concept paid GECC for the mobile home. However, in September of 1982 New Concept defaulted by failing to make payments on the mobile home thereby breaching its agreement with GECC.

Following New Concept's default, on September 23, 1982, GECC demanded that Fuqua repurchase the mobile home pursuant to their agreement between New Concept, GECC, and Fuqua. Sometime during the first few days of October, 1982, in accordance with agreement, an inspection was made by representatives of both GECC and Fuqua in order to ascertain any dam-

aged or missing items on the mobile home, and a list of these items was prepared. This inspection was necessary before Fuqua could remove the mobile home from New Concept's lot. Mike Stockton, President of New Concept, signed this inspection list immediately after the inspection was completed. Although the repurchase agreement provided that the mobile home be picked-up within ten days of New Concept's default, Fuqua did not remove the mobile home from New Concept's lot until October 18, 1982.

On October 10, 1982, the Andersons and Elmer Anderson's mother, went to the retail lot of New Concept in Times Beach to look for a mobile home. The Andersons became interested in a big, yellow Fuqua Model 961 mobile home, the mobile home at issue here. It was the only Model 961 Fuqua mobile home on the lot. During the next two weeks the Andersons negotiated with Mike Stockton for the purchase of this mobile home. The Andersons were, throughout this period of time, unaware of the fact that Fuqua was repurchasing the mobile home from New Concept, and it was admitted by Mark Starkey, a salesman for Fuqua, that he had stalled in repossessing the mobile home from New Concept because he knew they had a deal pending for the Andersons to purchase the mobile home.

In the meantime Mr. Anderson had attempted to obtain a loan for the purchase of the mobile home and was told that the bank required a contract to apply for a loan. On October 22, 1982, Mr. Anderson and Mr. Stockton had a telephone conversation during which Mr. Anderson informed Mr. Stockton of this fact and an appointment was made to sign the papers at 8:00 a.m. the following day at Stockton's real estate office in Union, Missouri. The contract for the sale of the mobile home was prepared and signed on October 23, 1982.

After signing the contract the Andersons went back to work until noon and then took

1. The jury returned a verdict for the plaintiffs on Count I of their petition against Bourbeuse View, Inc., doing business as New Concept Homes for breach of contract. Bourbeuse View, Inc., is not a party to this appeal.

the contract to Carondelet Savings & Loan in Arnold, Missouri, to apply for a loan. They paid Carondelet $167.50 for the appraisal and a credit report, which they never recovered.

Early the next week Mr. Stockton was notified by Fuqua that the mobile home had been removed from his lot at Times Beach. His dealership had been cancelled because of his financial problems. Fuqua did not know of the contract entered into between the Andersons and Stockton on October 23, 1982. When Stockton could not deliver the mobile home to the Andersons this law suit was instituted by the Andersons against Fuqua.

■ In order to establish a claim for tortious interference with contract under Missouri law plaintiff must establish the following elements: (1) that a contract was in existence; (2) that the defendant had knowledge of the contract; (3) that the defendant induced or caused the breach of the contract; (4) that the defendant's acts were without legal justification; and (5) that plaintiff was thereby damaged. *Minnesota Mining and Manufacturing Co. v. Williamson*, 675 S.W.2d 951, 953 [1] (Mo.App.1984); *Fischer, Etc. v. Forrest T. Jones and Co.*, 586 S.W.2d 310, 315 [8] (Mo.App.1978). Fuqua contends that the evidence is insufficient to support a cause of action because there was a failure of proof with respect to the fourth element, lack of justification. Since we agree it is unnecessary to consider whether there was a similar failure with respect to any other element of the cause of action.

In determining whether the trial court erred in sustaining defendant's motion for a directed verdict at the close of the plaintiffs' evidence, the appellate court must consider the evidence from the viewpoint most favorable to the plaintiff and give him the benefit of every reasonable inference which the evidence tended to support. *Jurcich v. General Motors Corp.*, 539 S.W.2d 595, 597 [1] (Mo.App.1976). Although some jurisdictions take the position that a claim of absence of justification is in the

nature of an affirmative defense, under Missouri law plaintiff has the burden of producing substantial evidence in support of this element of the cause of action. No fact essential to submissibility may be inferred in the absence of a substantial evidentiary basis. *Tri-Continental Leasing Co. v. Neidhardt*, 540 S.W.2d 210, 211 [1, 3] (Mo.App.1976). In fact, *Tri-Continental* makes it clear that a defendant cannot be held liable under this tort based upon speculation, conjecture, or guesswork. Thus, the question at issue becomes whether appellants carried their burden of proof regarding absence of justification.

■ Appellants allege that Fuqua's act of removing the mobile home from the New Concept lot was "intentional and without justification." Appellants present two arguments which they contend support their claim that they have made a submissible case of tortious interference of contract.

The backbone of appellants' first argument is that Fuqua had already breached its agreement with GECC regarding repurchase by waiting longer than ten days to remove the mobile home from New Concept's lot. Appellants contend Fuqua was notified by letter from GECC dated September 24, 1982, that it was to repurchase the mobile home held by New Concept. Under the terms of the agreement appellants maintain that the mobile home should have been repurchased and removed from the New Concept lot by Fuqua before the appellants negotiated its purchase. Appellants further maintain that a representative of Fuqua intentionally stalled the repurchase in hopes that the sale to them would be approved. This argument is without merit. It is undisputed that Fuqua picked up the mobile home pursuant to a demand from GECC under a pre-existing agreement. The relevant portion of the transcript reads as follows:

Q. And had you talked to Mark Starky of Fuqual Homes in early October of 1982 and gave Fugua permission to pick up that home?

A. [Mike Stockton] That was an automatic provision in the General Electric Credit.

Q. That Fuqua had a right to pick up that home, is that correct?

A. Yes.

Once it has been established that Fuqua had a legal right to pick up the mobile home, appellants' cause of action for tortious interference with contract fails.

The court in *Friedman v. Edward L. Bakewell, Inc.*, 654 S.W.2d 367 (Mo.App. 1983) reaffirmed the principle that one may be justified in interfering with a contract, via a legal right to do so. Quoting from *Pillow v. General American Life Insurance Co.*, 564 S.W.2d 276, 281–82 [6] (Mo. App.1978) which relied on *Orr v. Mutual Benefit Health and Accident Assoc.*, 240 Mo.App. 236, 207 S.W.2d 511 (1947), the court in *Friedman* said:

> "*Orr*, supra, stands for the proposition that no liability for procuring a breach of contract exists where the breach is caused by the exercise of an absolute right, that is, an act which one has a definite legal right to do without any qualification. 207 S.W.2d 1.c. 515 [5], 84 ALR 63.

> \* \* \* \* \* \*

> However, it is not justification to knowingly procure the breach of a contract where the defendant acted with an improper purpose and sought not only to further his own interest, but in doing so employed improper means. 86 C.J.S. Torts, § 44, p. 967."

654 S.W.2d at 369–70 [4]

Based upon Missouri's case law, to present a submissible case, the appellants must produce evidence showing respondent's actions in removing the mobile home were either "qualified" or accomplished by "improper means." Appellants contend that Fuqua cannot assert an "unqualified right" to remove the mobile home from New Concept's lot because Fuqua waited over ten days in complying with the request from GECC to repurchase the mobile home after default. Appellants argue that when Fuqua exercised its discretion in determining when the mobile home should be repurchased it qualified the request from GECC. However, appellants cite no case law in support of their proposition that a contract without qualification automatically becomes qualified due to a delay in its exercise. Additionally, appellants presented no evidence to show Fuqua employed "improper means" in repurchasing the mobile home. These reasons standing alone are sufficient to establish that the appellants failed to prove by substantial evidence there was an absence of justification when Fuqua repurchased the mobile home.

The gravemen of appellants' second argument that removal of the mobile home was without justification is based on the notion that no economic interest of Fuqua was threatened by the performance of the appellants'/New Concept contract. Appellants allege that because the contract between themselves and New Concept may have been performed, and GECC may have received the money due, Fuqua had no right to interfere. Appellants rely on *Juengel Const. Co. v. Mt. Etna, Inc.*, 622 S.W.2d 510 (Mo.App.1981) for the proposition that when a contract does not threaten a party's pecuniary interest or require interference with the contract for its protection, the arbitrary interference with the contract based on mere speculation could not be justified and constitutes tortious interference with contract.

In *Juengel*, plaintiff was to act as general contractor in remodeling a portion of a shopping center whose prime tenant was National Supermarket. National had agreed to pay any construction costs exceeding $500,000. When National learned that the project would cost $805,009, it directed the architects to have the project rebid. Plaintiff filed suit in two counts, one for lost profits from breach of contract and one for actual and punitive damages for tortious interference with contract. In appealing the judgment for plaintiff, National asserted its justification in order to

protect its legitimate financial interest in minimizing construction costs. This court affirmed, finding that the contract did not threaten National's pecuniary interests and also because it was mere speculation on National's part that it could benefit by interfering with the contract. 622 S.W.2d at 516 [13].

Appellants here contend it was this type of speculation on the part of Fuqua that prompted removal of the mobile home from New Concept's lot. However, this argument lacks merit for three reasons. First, *Juengel* is readily distinguishable. National admitted that it thought the plaintiff's bid was to high and was hoping for a lower bid. The evidence clearly showed National induced the breach upon speculation that it could benefit financially. In the case at bar, no evidence has been shown that Fuqua removed the home because it could benefit financially. Second, Fuqua had a legal right to remove the home. In *Juengel*, National was not acting pursuant to a legal right.

Third, appellants readily admit it is fundamental that one with a "bonafide legal economic interest to protect" is privileged to prevent performance of a contract which threatens such interest. Prosser on Torts, Second Edition, ch. 23, § 106, p. 737; *Francisco v. Kansas City Star Co.*, 629 S.W.2d 524, 534 [9, 11] (Mo.App.1981): *Pillow v. General American Life Insurance Co.*, 564 S.W.2d at 282 [7]. Respondent had such a justifiable economic interest at stake. At the point of default, Fuqua had a Model 961 mobile home worth approximately $40,000 on the lot of a dealer who could not afford to pay for it. Following New Concept's default, Fuqua exercised its legal right to protect its property. New Concept knew the consequences of default. Any action taken on the mobile home by New Concept after default was taken completely at New Concept's risk.

We conclude that, absent any proof that Fuqua's actions were improper or wrongful, appellants simply failed to submit a submissible case for tortious interference

with contract. Accordingly, the judgment is affirmed.

CRIST and SMITH, JJ., concur.